**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LifeScan Global Corporation, *et al.*,[1] | ) Case No. 25-90259 (ARP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIFESCAN GLOBAL CORPORATION AND ITS DEBTOR AFFILIATES**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases (the "**Chapter 11 Cases**") of LifeScan Global Corporation ("**LifeScan**", and together with its subsidiaries, the "**Company**") and its affiliated debtors and debtors-in possession (collectively, the "**Debtors**"), by and through its undersigned proposed counsel, hereby files this objection (the "**Objection**") to the Debtors' motion [Docket No. 138] (the "**Disclosure Statement Motion**") seeking, among other things, conditional approval of the Debtors' proposed *Disclosure Statement for Joint Chapter 11 Plan of LifeScan Global Corporation and Its Debtor Affiliates* [Docket No. 137] (the "**Disclosure Statement**") in respect of the Debtors' proposed *Joint Chapter 11 Plan of Reorganization of LifeScan Global Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 136] (the "**Plan**").[2] In support hereof, the Committee respectfully states as follows:

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: LifeScan Global Corporation (1872); DUV Holding Corp. (2522); DUV Intermediate Holding Corp. (2645); LifeScan Texas LLC (1307); DUV Intermediate Holding II Corp. (4829); LifeScan Inc. (8188); LifeScan IP Holdings, LLC (7450); LifeScan China, LLC (N/A) and LifeScan Institute LLC (8188). The location of Debtor LifeScan Global Corporation's principal place of business and the Debtors' service address in the Chapter 11 cases is 75 Valley Stream Parkway, Suite 201, Malvern, PA 19355.

[2]   Each capitalized term that is not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement or the Plan.

## PRELIMINARY STATEMENT

1.     The Committee appreciates that, at this stage, the Court is being asked to assess the informational adequacy of the Disclosure Statement as opposed to confirmation of the Plan. However, as previewed earlier in pleadings filed with the Court, the Committee indeed believes that the Plan is irredeemably flawed and cannot be confirmed. Among other infirmities, the Plan (a) proposes an impermissible equity distribution to the Sponsor, (b) offers preferential treatment to the third lien lenders, whom the Debtors believe are entirely unsecured, compared to other unsecured creditors, (c) understates distributable value and offers the holders of more than $1 billion in general unsecured claims less than a 1% recovery, (d) potentially undervalues the Reorganized Debtors' enterprise value, which could result in the prepetition lenders receiving more than payment in full, and (e) offers valuable releases to the prepetition lenders, the Debtors' officers and directors, and the Sponsor without adequate (if any) consideration in exchange.

2.     The Plan's defects appear to be the result of an insider-driven and deeply flawed plan process. The Debtors' board of directors (the "**Board**") consists entirely of employees of the Sponsor. Despite the Board's conflict of interest arising from the releases provided in the Plan and the new equity being distributed to the Sponsor thereunder, no independent directors were appointed, nor was an independent special committee established, to negotiate the terms of the insider-related Plan provisions, evaluate restructuring alternatives that may have provided less favorable treatment to the insiders, or conduct an investigation into potentially valuable estate claims or avoidance actions against insiders that are proposed to be released under the Plan.

3.     Rather, the Sponsor and the Debtors' directors and officers appear to have ignored a basic tenet of good governance, in violation of their fiduciary duty, by approving a plan that benefits insiders at the expense of the Debtors' unsecured creditors without any independent

oversight. Consequently, when evaluating the good faith nature of the Plan, the Debtors should not be entitled to deference under the business judgment standard.

4.      The Committee will be prepared to address these issues at confirmation (subject to the completion of discovery by the Debtors and other third parties).[3] In the interim, additional disclosure should be required to afford creditors—and this Court—a meaningful opportunity to evaluate the Plan and the circumstances leading to its negotiation and filing. Currently, the Disclosure Statement fails to include material information with respect to the following:

(a)      the circumstances and details with respect to the need for the Debtors' initial forbearance agreement with its prepetition lenders, as well as the Debtors' CGM forecast at that time;

(b)      the circumstances surrounding the prepetition lenders' request, and the Debtors' acquiescence, with respect to withholding payments to the Rebate Counterparties after inducing such parties to put the Debtors' products on formulary;

(c)      the circumstances and details surrounding the requests by the Debtors to the Rebate Counterparties to reduce the rebate payments by unprecedented amounts and to agree to additional terms that may not have even been permissible from a regulatory perspective under certain of the Rebate Agreements;

(d)      the effect of the Debtors' inability to reach agreement with the Rebate Counterparties and the rejection of the Rebate Agreements on the Debtors' go-forward BGM

---

[3]      The Committee has initiated informal discovery against the Debtors and the Sponsor, and the Committee reserves the right to supplement such discovery as well as seek discovery from other third parties. While the Debtors have begun producing documents in response, the Committee reserves the right to seek further relief from the Court in the event that the Debtors or the Sponsor do not timely complete their productions in sufficient time for the Committee to be able to fulfill its own fiduciary duty.

business in the United States, the CGM product launch and the ultimate impact on the Debtors'
enterprise value;

(e)    the current status of the Debtors' development agreement with its "CGM
partner," including whether the agreement remains in effect, what caused the multi-year delay in
the CGM product launch, how the Debtors tracked (or failed to track) the lack of progress made
since the agreement was signed in 2019, whether causes of action exist against that CGM
partner, the Debtors' current efforts to find a new CGM development partner, and whether the
Debtors' current relationship with their PBMs affected the Debtors' ability to find a new CGM
development partner;

(f)    the reasons for the Debtors' prepetition repurchase and repayment of
revolver and first lien term loan debt using cash generated from the non-payment of rebate
payments, including whether the Debtors conducted an independent investigation to determine if
any of those payments are subject to avoidance;

(g)    the timing of the Debtors' bankruptcy filing, when negotiations with the
Rebate Counterparties appear to have been at an impasse months earlier, coupled with the
apparent need to close the restructuring by year-end;

(h)    the Plan's condition that the Debtors maintain an amount of cash on the
Effective Date that is well above the Debtors' historical liquidity usage;

(i)    the absence of a CGM forecast (which could have a *significant* impact on
enterprise value) and the absence of a total enterprise valuation analysis, which is critical to
understanding value; and

(j)      the Debtors' analysis or investigation (if any) into the nature and colorability of any potential avoidance actions or any potential claims and causes of action against the "Released Parties", and the value of the releases proposed under the Plan.

5.      Accordingly, the Committee respectfully submits that the Disclosure Statement should not be approved unless it is supplemented with additional information that the Committee believes is critically necessary for creditors and this Court to properly assess the Plan.[4]

## BACKGROUND[5]

### A.      General Case Background

6.      On July 15, 2025 (the "**Petition Date**"), the Debtors commenced the Chapter 11 Cases. The next day, on July 16, 2025, the Debtors filed an initial version of the Plan [Docket No. 21] and the Disclosure Statement [Docket No 22]. Two weeks later, on August 1, 2025, the Debtors filed the Disclosure Statement Motion [Docket No. 138], the updated Plan [Docket No. 136] and the updated Disclosure Statement [Docket No. 137].

7.      For tax reasons, the Debtors indicate that the Restructuring must close before year-end, which, in turn, the Debtors indicate would require this Court's approval of the Plan (or sale) by mid-October so as to afford time for regulatory approvals.[6]

### B.      Events Leading to the Debtors' Chapter 11 Cases and Proposed Plan

8.      As discussed in the *Declaration of Valerie Asbury in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 20], LifeScan's financial position has deteriorated over the past few years due to significant changes in the diabetes management

---

[4]     The Committee will endeavor to narrow (if not resolve) its comments to the Disclosure Statement in advance of the Disclosure Statement hearing.

[5]     The description in this background section remains subject to the Committee's continuing investigation and ongoing discovery.

[6]     The Committee is continuing to diligence the tax issues presented by the Debtors.

market, predominantly driven by the growing adoption of continuous glucose monitoring

("**CGM**") products, and the resulting steady decline in LifeScan's blood glucose monitoring

("**BGM**") business.

**C.      2023 Transaction**

9.      Prior to May 2023, the Company's capital structure consisted of approximately

(i) $75 million in superpriority first lien revolving loans set to mature on October 1, 2023,

(ii) $1.036 billion in first lien term loans set to mature on October 1, 2024, and (iii) $275 million

in second lien term loans set to mature on October 1, 2025.

10.      On May 19, 2023, LifeScan entered into a transaction (the "**2023 Transaction**")

whereby (i) the maturity dates for the revolving loans were extended to October 1, 2026 and July

2, 2025, respectively,[7] (ii) most of the first lien term loans were exchanged into new first lien

term loans with an extended maturity date of December 31, 2026; and (iii) the second lien term

loans were exchanged into new second lien term loans with an extended maturity date of March

1, 2027.

11.      Certain incumbent first lien lenders elected not to participate in the exchange, and

were rendered "third priority" lenders, but their maturity date of September 2024 was unaffected.

The Debtors do not describe how, at that point in time, they expected to address the near-term

September 2024 maturity of the "third lien" debt (on which the Debtors ultimately defaulted).

**D.      Delayed CGM Product Launch**

12.      The Debtors describe the 2023 Transaction as intending to bridge to their CGM

product launch, but that LifeScan's CGM development partner experienced development delays,

hindering and ultimately preventing the timely launch (without providing more detail). The

---

[7]     As part of the 2023 Transaction, the revolver was split into two facilities, each with its own extended maturity
date.

Debtors do not describe their CGM forecast or regulatory timeline at the time of the 2023 Transaction, and whether it was achievable within the September 2024 maturity of the third lien debt.

**E.     Prepetition Forbearance Agreements and Non-Payment of Rebate Payments**

13.     When the third lien loans matured on October 1, 2024 (and the payment of $27.4 million became due), the decision was made not to repay them—despite the Debtors having sufficient cash on hand at that time to repay the third lien loans and still have a remaining cash balance consistent with their historical average cash balance.  Instead, the Debtors entered into a forbearance agreement ("**FBA**") with an ad hoc group of prepetition first and second lien term loan lenders. The FBA was successively amended and extended over the course of seven months.

14.     Significantly, as part of one of the FBA extensions in December 2024, the prepetition lenders appear to have restricted LifeScan from making any rebate payments owed to the Rebate Counterparties (*i.e.*, pharmacy benefit managers ("**PBMs**"), state Medicare agencies, and state Medicaid agencies) under their Rebate Agreements. Subsequent FBA extensions appear to have imposed a requirement on the Debtors to obtain material and unprecedented discounts to the rebate payments and other amendments to the Rebate Agreements that likely run afoul of applicable regulatory requirements.

15.     It is unclear from the Disclosure Statement whether and the extent to which the long-term consequences of the decision to halt rebate payments was adequately considered by LifeScan and the prepetition lenders, or whether there was an exclusive focus on accumulating near-term cash at the expense of the long-term value of the Debtors, to the extreme detriment of the Debtors' contractual counterparties who became massive general unsecured creditors as a result of the Debtors' actions.

16.     Indeed, the non-payment of the rebate payments resulted in increased income that triggered "previously unanticipated" substantial income tax liabilities for fiscal year 2024 and for fiscal year 2025. As noted above, the Debtors purport to have structured the Plan such that the otherwise-projected tax liability for 2025 may not be incurred if confirmation occurs in mid-October and closing occurs by year-end (but the Disclosure Statement does not explain why the Debtors waited until July 15th to file their bankruptcy cases and thereby pressure unsecured creditors with an extremely tight case timeline).

17.     Moreover, the damage caused to the Debtors' relationship with PBMs may have materially and adversely affected LifeScan's BGM business volume in the United States, which is now limited to self-pay customers, and may have hurt the Debtors' ability to move forward with their CGM product launch.

18.     Ultimately, the near-term generation of cash for the benefit of the prepetition lenders as a result of halting rebate payments (which, as described below, was used in part to repay first lien debt, albeit at a discount) came at the expense of the Debtors' contract counterparties and resulted in the creation of $1 billion of general unsecured claims, who are now being offered less than a penny on the dollar.

**F.     Initial and Subsequent Restructuring Support Agreements**

19.     On February 17, 2025, LifeScan entered into an initial restructuring support agreement (the "**Initial RSA**") with the ad hoc group of prepetition lenders and the Sponsor. The Initial RSA set forth a toggle approach, requiring the Company to simultaneously pursue an out-of-court restructuring but to prepare for an in-court chapter 11 proceeding in the event certain conditions were not met.[8]

---

[8]     Notably, in the event LifeScan were to commence chapter 11 cases, the Initial RSA expressly provided that the existing equity holders (*i.e.*, the Sponsor) would be entitled to receive a distribution under the chapter 11 plan in

20.     The Initial RSA required the Company to further negotiate with their PBMs and achieve settlements acceptable to the ad hoc lender group. The Initial RSA also required the Company to conduct auctions for the repurchase of first lien debt.

21.     On July 15, 2025—the five-month delay from the execution of the Initial RSA to the bankruptcy filing is not explained in the Disclosure Statement[9]—the Initial RSA was amended and restated, and the Debtors shortly thereafter commenced the Chapter 11 Cases. The RSA was further amended on August 1, 2025 (the "**RSA**"), to reflect a settlement reached with the third lien lenders. The Plan and Disclosure Statement currently on file appear to reflect the terms of the RSA.

## G.     2025 First Lien Debt Repurchases and Repayments

22.     Over the course of 2025, while simultaneously refusing to pay any money to Rebate Counterparties despite enjoying the benefits of being on their formularies, the Company voluntarily paid a total amount of approximately $376 million to repay approximately $515 million in face value of first lien debt (the "**First Lien Debt Repayments**"), as follows:[10]

(a)     **March 5, 2025:** $167 million in face value of first lien term loans was repurchased for $100 million (representing a 40% discount);

(b)     **March 11, 2025**: $114 million in face value of first lien term loans was repurchased for $62 million (representing a 45% discount);

(c)     **July 2025** (prior to the Petition Date): The revolving loan, in the amount of approximately $94 million, was fully repaid; and

---

an amount equal to 5% of the new equity of reorganized LifeScan, and would not be entitled to any further management fees or be party to any further consulting or services agreements.

[9]     The Committee understands that negotiations with at least one significant Rebate Counterparty were concluded by mid-April 2025, effectively eliminating any chance of an out-of-court workout, yet the Debtors did not file their chapter 11 cases for three more months.

[10]    These amounts exclude approximately $62 million in term loan amortization payments over the course of 2025.

(d)      **July 15, 2025** (*i.e.*, the same date as the Petition Date): $140 million in face value of first lien term loans was repurchased for $119 million (representing a 15% discount).

23.      Based on information presently available to the Committee, throughout the period of time during which the Company negotiated and/or implemented the 2023 Transaction, the successive FBAs, the Initial RSA, the PBM settlement discussions, the First Lien Debt Repayments, and the subsequent RSA, all members of the Board of Directors were employees of the Sponsor, and no independent director or special committee was appointed or established.

**H.      General Description of Plan**

24.      The Plan contemplates a toggle approach, pursuant to which the Debtors are pursuing confirmation of a chapter 11 reorganization under the Plan, while, at the same time, marketing their assets for sale, such that, in the event the Plan is not approved, and a third-party refinancing bid does not materialize, the Debtors will pivot to a sale to the prepetition lenders in the form of a credit bid (which would carry-over the treatment sections of the Plan).

25.      ***First Lien Lender Treatment:*** Under the Plan, the first lien lenders would receive (a) new first lien debt, entitling them to excess cash flow sweeps following the Effective Date, (b) the right to forego up to $30 million of new first lien debt in exchange for up to 20% of the new equity (the "**Equitization Election**"), and (c) the payment of excess cash as of the Effective Date of at least $132.5 million (although the actual pay down amount is expected to be even higher), calculated based on a complex formula. The Disclosure Statement estimates $376 million in first lien claims, and further estimates the Plan recovery to first lien lenders to range from 97% to 100%.

26.      ***Second Lien Lender Treatment:*** The second lien lenders would receive their *pro rata* share of 100% of the new equity of the Reorganized Debtors ("**New Equity Interests**"), subject to dilution by new equity issued in connection with Equitization Election, the "Advisory

Equity" (described below) and the MIP. The Disclosure Statement estimates that the second lien lenders are secured in the amount of $176 million, with an estimated Plan recovery of 37% to 63%, leaving an unsecured deficiency claim of $134 million, to be treated as a General Unsecured Claim under the Plan.

27. **Third Lien Lender Treatment:** The third lien lenders, who hold $31 million in claims that the Debtors indicate are *entirely unsecured for purposes of the Plan*, would receive $10 million in cash, representing a 30% recovery (in contrast to the less than 1% recovery to general unsecured creditors, as described below).

28. **General Unsecured Claim Treatment:** The class of General Unsecured Claims, estimated to be approximately $1.116 billion (inclusive of the second lien lenders' purported deficiency claims), would receive only $10 million in cash, *representing a recovery of less than 1%*, according to the Disclosure Statement.

29. **Sponsor Treatment:** The Plan nominally purports to cancel all existing equity interests without a distribution. But in a spurious attempt to work around the absolute priority rule, the Plan provides that the Sponsor will be entitled to 5% of the New Equity Interests as a fee in exchange for entering into a vaguely described "consulting agreement." The Sponsor will also be entitled to (a) the reimbursement of legal fees and expenses of up to $1 million, (b) continuing indemnification, and (c) valuable releases without adequate consideration being provided in exchange.

30. The Disclosure Statement makes no mention of any independent investigation that may have been conducted to evaluate the Sponsor's treatment under the Plan, the treatment of the Debtors' directors and officers, the benefits (if any) to the Debtors' estates associated with

the consulting agreement, whether alternatives were solicited, or the value of the releases being offered to the Sponsor.

**I.      Committee's Preliminary Views of the Plan[11]**

31.     Based on information currently available to the Committee, for the reasons described below, the Committee believes that the Plan is not confirmable.

**(a)      The Disclosure Statement Understates Value**

32.     Under the Bankruptcy Code, a chapter 11 plan that has not been accepted by all creditor classes (which the Plan will not be) can only be confirmed if the plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. That section memorializes the absolute priority rule, pursuant to which junior classes may not receive a recovery unless all senior classes are paid in full, as well as a corollary rule, that senior classes cannot receive more than full compensation for their claims.

33.     As will be demonstrated at the Confirmation Hearing, the Committee believes that the Disclosure Statement may understate distributable value and is predicated upon an artificially contrived enterprise valuation that potentially undervalues the Debtors' assets. Consequently, the Committee believes that the proposed treatment of the prepetition lenders may be unlawful, insofar as certain of the lenders are paid more than in full, in violation of the absolute priority rule, and that the proposed treatment of General Unsecured Claims is insufficient under the Bankruptcy Code.

---

[11]     The Committee expressly reserves the right to modify or add any and all objections the Committee may have to the Plan, and all such rights are expressly reserved.

### b.      Illegal Plan Distribution to Sponsor

34.      The distribution to the Sponsor, while General Unsecured Claims remain *massively* impaired, represents a violation of the absolute priority rule. The payment of 5% of the New Equity Interests (and other consideration) to the Sponsor is clearly, in substance, a Plan distribution to the Sponsor on account of its existing equity interests: (a) the Plan expressly provides that on the Effective Date, the Reorganized Debtors shall enter into an Advisory Agreement with the Sponsor, in exchange for the Sponsor or its designee receiving 5% of the New Equity Interests (*see* Plan art. I.A.); (b) the Advisory Agreement constitutes an element of the "Restructuring Transactions" (*see* Plan art. IV.B.); (c) the Advisory Agreement constitutes a "Definitive Document" (*see* Plan art. I.A.) and is required to be executed by the Debtors, along with all other Definitive Documents, on the Effective Date of the Plan (*see* Plan art. IV.B.); and (d) the execution of the Advisory Agreement, along with all other Definitive Documents, is incorporated into the conditions precedents to the effectiveness of the Plan (*see* Plan art. IX.A.1, 5, 6).

35.      Tellingly, the Disclosure Statement itself provides no information concerning the need or justification for the Advisory Agreement; all that is provided is a short sentence in the Restructuring Term Sheet (which is an exhibit to an exhibit to the Disclosure Statement), indicating that pursuant to the Advisory Agreement, "the Sponsor agrees to make its representatives available to the Reorganized Company or Bidco upon the Reorganized Company's or Bidco's reasonable request to, among other things, assist and provide advice with respect to strategic initiatives and transition and operational matters" and that "[a]s consideration for its services under the Advisory Agreement, the Sponsor shall receive the Advisory Equity and no other consideration. The Advisory Agreement shall have a term of not less than three

years from the Transaction Effective Date and other terms acceptable to each of the Sponsor and the Required Consenting Lenders." Disclosure Statement, Ex. B. The Committee believes that such a payment to the Sponsor constitutes a direct violation of the absolute priority rule.

### c.   Unfair Discrimination Against General Unsecured Creditors

36.    The Committee believes that the Plan unfairly discriminates between its general unsecured creditors and the third lien lenders. Though entirely unsecured (according to the Debtors, based on their "implied equity valuation" approach), the third lien lenders would receive $10 million in cash, representing a 30% recovery, while general unsecured creditors would receive $10 million in cash for the entire $1 billion class of general unsecured claims, representing a 1% recovery. Under the Debtors' view of enterprise value (which the Committee does not concede), such treatment is patently discriminatory.

### d.   Impermissible Releases

37.    Under Section 1123(b)(3)(A), a plan may provide for the settlement or adjustment of a claim belonging to the estates. *See In re Bigler LP*, 442 B.R. 537, 543-44 (Bankr. S.D. Tex. 2010) (recognizing debtor's ability to settle claims under 1123(b)(3)(A), including the release of claims by the estate). The Plan provides for the release by the Debtors and all "Releasing Parties" (which includes creditors that vote to accept the Plan or who were given notice of the opportunity to opt out of the releases but do not affirmatively opt out) of a broadly-defined universe of "Released Parties" (including, among others, the Debtors, the Sponsor, the Consenting Lenders, and each of their Related Parties) from practically all claims and causes of action that may be asserted against the Released Parties.[12]

---

[12]    The Committee notes the claims and causes of action being released include any claim arising from "any action or inaction related to the payment or non-payment of any tax liabilities (or estimates thereof)". The Committee is investigating whether the Sponsor (to the extent otherwise responsible for tax payments) or the Debtors'

38.     The Plan provides for the release by the Debtors and the "Releasing Parties" of any and all claims and causes of action, that may be asserted against the broadly-defined universe of "Released Parties."[13] However, the Committee believes the releases of the prepetition lenders, the Sponsor and the Debtors' current and former directors and officers are impermissible absent an evidentiary demonstration by the Debtors that (a) an independent third party conducted a proper and meaningful investigation into any potential claims or causes of action against the broadly-defined universe of Released Parties, and (b) the Released Parties paid fair value for any released claims. Indeed, subject to the Committee's continuing investigation, the Committee believes that there may be multiple, colorable claims against certain of the Released Parties.

39.     While the Debtors claim the releases are "in exchange for good and valuable consideration," Disclosure Statement IV.I.3, the Disclosure Statement as it currently stands fails to describe any consideration being provided from certain of the Released Parties. In short, the releases appear to be "table stakes" for each of the preferred groups under the RSA, while leaving general unsecured creditors with virtually no recovery and no claims to pursue after confirmation of the Plan.

###        e.     Plan Has Not Been Proposed in Good Faith

40.     The Committee believes that the Debtors cannot meet their burden of demonstrating that the Plan was proposed in good faith, as required under section 1129(a)(3) of the Bankruptcy Code. The Plan includes an insider transaction involving the Sponsor and contemplates valuable releases of the Sponsor and others. Yet, based upon information and

---

directors and officers are exposed to preference risk associated with the payment of the 2024 tax payments arising from the Debtors' elevated taxable income due to their withholding rebate payments.

[13]   The Committee notes that the Debtor releases do not contain the typical "bad faith, gross negligence or willful misconduct" carve-out.

belief, all members of the Debtors' Board of Directors are employees of the Sponsor. As far as the Committee is aware, at no relevant point did the Board of Directors appoint an independent director or independent special committee to negotiate with the Sponsor and prepetition lenders or conduct an independent investigation into potential claims or causes of action against the Sponsor, the Debtors' current and former directors and officers and/or prepetition lenders.

41.    Although the Committee's investigation remains in progress, based on information available to the Committee, the Committee believes that potential estate claims against the Sponsor, the Debtors' current and former directors and officers, and/or the prepetition lenders may exist.

## OBJECTION

42.    Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain "adequate information," which is defined as "information of a kind, and in sufficient detail . . . [to enable] a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a). Courts consider numerous factors when determining the sufficiency of the information in a disclosure statement. *See In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401–02 (Bankr. S.D. Tex. 2016) (citing *In re Metrocraft*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984))

43.    Here, the Disclosure Statement fails to provide adequate information necessary for creditors and this Court to evaluate the Plan, including the Reorganized Debtors' enterprise value, the adequacy of distributions to general unsecured creditors under the Plan, potential estate claims and causes of action, the value of the consideration being offered to insiders under the Plan, and the value of the releases being offered under the Plan.

44.    *2023 Transaction:* The Disclosure Statement should provide additional information regarding the 2023 Transaction, including, without limitation, (a) the nature and

amount of any fees paid and to whom, (b) any additional collateral granted to the prepetition lenders, (c) LifeScan's liquidity and financial forecasts at the time, as well as their CGM forecast and anticipated CGM product launch timeline, and (d) how LifeScan was planning to address the non-extending third lien maturity date.

45. ***Forbearance Agreements:*** The Disclosure Statement should provide additional disclosure concerning the circumstances surrounding the FBAs and PBM negotiations, including the following: (a) a brief description of the key terms and conditions of the FBAs, including, most notably, the prepetition lenders' decision to restrict payments to Rebate Counterparties and require dramatic changes to the Rebate Agreements; (b) the disclosure of the periods of time during which LifeScan was in active discussions or negotiations with its Rebate Counterparties, including when those negotiations began and concluded; (c) a brief description of the Debtors' 2024 and 2025 formulary processes, including whether the 2025 formulary process was a factor in the timing of the commencement of the Chapter 11 Cases; (d) a brief description of LifeScan's consideration, at the time the decision was made to halt rebate payments, of the tax, commercial and long-term business ramifications of halting payments to the Rebate Counterparties, including the effect on the Debtors' go-forward BGM business line in the United States, the CGM product launch and, ultimately, the Debtors' enterprise value; (e) additional disclosure regarding the (i) amount of the tax payments made or anticipated for 2024 and 2025, (ii) whether and the extent to which those tax liabilities were taken into account by LifeScan prior to entry into certain of the FBA extensions, (iii) when the 2024 tax payment was made, (iv) when LifeScan determined that the Restructuring needed to close by year-end 2025, and (v) why LifeScan waited to file the Chapter 11 Cases until July 2025.

46.     ***CGM Partner Contract:*** The Disclosure Statement should disclose additional information about LifeScan's contract and relationship with its CGM partner, including the following: (a) a general description of the material terms of the contract and the initial anticipated product launch timeline; (b) disclosure of the amount invested by LifeScan in its arrangements with the CGM partner; (c) a reasonably detailed explanation, beyond what is currently provided in the Disclosure Statement, for the delay in the product launch, and what efforts LifeScan undertook to facilitate the product launch; (d) whether the Debtors have investigated and/or identified potential claims or causes of action against the CGM partner; (e) a definitive explanation as to the current status of the CGM contract; (f) a more detailed explanation of the Debtors' current efforts to "explore and evaluate potential future opportunities in the CGM market" and the "timing of finalizing an expected agreement with a third-party"; and (g) the extent to which LifeScan's prepetition interactions with the Rebate Counterparties and the Debtors' determination to reject the Rebate Agreements affected the Debtors' revenue with respect to the BGM business going forward, and the CGM product launch.

47.     ***Corporate Governance:*** The Disclosure Statement should (a) confirm the affiliations of LifeScan's Board of Directors appointed since the Sponsor's acquisition, (b) specify whether the directors were or are employees of the Sponsor and whether at any point since or prior to the Amend and Extend Transaction any independent directors or independent special committees were appointed or established, and (c) provide additional information regarding same. The Disclosure Statement should also disclose whether the Sponsor participated in the restructuring negotiations directly and whether the Sponsor delivered any restructuring proposals on its own behalf to LifeScan or the prepetition lenders.

48. **Excess Cash:** The Debtors should disclose the basis for the Plan's condition to effectiveness requiring that the Debtors maintain $150 million in Liquidity on the Plan Effective Date, as well as the business justification for maintaining such a high cash balance—which the Debtors expect will grow to $138 million by year-end 2025—as compared to its historical liquidity usage, taking into account the proposed $75 million exit credit facility which the Debtors expect will remain undrawn during the forecast period.

49. **Valuation Analysis:** The Disclosure Statement should provide a formal valuation analysis of the Reorganized Debtors' assets. An independent valuation analysis is critical to a chapter 11 disclosure statement, and is necessary to enable creditors and this Court to determine the enterprise value of the Reorganized Debtors, whether the prepetition lenders are in fact being paid more than in full, and the value of consideration being offered to the Sponsor (among other issues).  *See, e.g.*, *In re Cardinal Congregate I*, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) ("Disclosure Statement should clearly identify all assumptions made in calculating pro forma information and should set forth those facts supporting all estimates. Information regarding the accounting and valuation methods used in preparation of the Disclosure Statement's financial exhibits must also be included."); *In re Radco Props., Inc.*, 402 B.R. 666, 676 (Bankr. E.D.N.C. 2009) (disclosure statement did not contain adequate information where it only provided a liquidation analysis and otherwise lacked crucial information that a creditor would need to make an informed judgment about plan); *In re Abijoe Realty Corp.*, 943 F.2d 121, 128 (1st Cir. 1991) (upholding bankruptcy court decision to dismiss chapter 11 case including due to debtor's disclosure statement lacking a valuation of the debtor's assets).

50. The Disclosure Statement references only an "imputed plan equity value" approach, which the Committee presumes was calculated based on the price implied by the

Equitization Election granted to the first lien lenders.  However, that election represents (a) a price negotiated by the first lien lenders, for (b) a minority piece of the New Equity Interests, and is not a genuine indicator of true enterprise value. The Committee believes that the pending sale process does not reflect a true proxy for market value, and in any event, does not absolve the Debtors from providing their independent view of the value of the New Equity Interests.

51.     ***CGM Forecast:*** The Debtors should disclose their financial forecast for the Debtors' CGM business, which is critical to determining enterprise value.

52.     ***Sponsor Treatment:*** The Debtors should disclose (a) who negotiated the Plan provisions related to the Advisory Agreement and the payment of 5% of the New Equity Interests to the Sponsor, (b) whether the 5% treatment ties to prepetition negotiations between the Sponsor and the lenders unrelated to chapter 11, (c) how the Debtors value the consideration being offered to Sponsor, (d) what specific benefits the Reorganized Debtors expect to receive under the Advisory Agreement, and (e) whether the terms of the Advisory Agreement and consideration to the Sponsor were marketed and are commercially reasonable in the Debtors' view.

53.     ***Sales Efforts:*** The Debtors should disclose the basis for LifeScan's determination not to employ an investment banker in connection with its forbearance and lender negotiations, and why PJT was not retained until a few days before the Petition Date. The Debtors should also disclose whether LifeScan conducted any efforts prior to the commencement of the chapter 11 cases to market itself or its assets for sale or to solicit any interest from third parties (other than the prepetition lenders) in any of the Debtors' assets or operations.

54.     ***Releases:*** The Debtors should indicate whether an independent investigation (or any investigation for that matter) was conducted with respect to any potential claims and causes

of action against any of the Released Parties and the conclusions derived therefrom. The Debtors should also describe and quantify any alleged consideration provided by the Released Parties.

55.     ***Litigation:*** The Debtors should also disclose additional information about any material litigation in which LifeScan is a plaintiff and the estimated value of that litigation.

56.     ***Committee Rider and Recommendation Letter:*** If the Court determines that solicitation of the Plan is appropriate at this time (despite the issues discussed above), the Committee requests that (i) the Disclosure Statement include a rider prepared by the Committee and (ii) the solicitation materials include a letter from the Committee, substantially in the form presented by the Committee to the Debtors in advance of the filing of this Objection.

## **CONCLUSION**

57.     The Disclosure Statement does not provide creditors with "adequate information" and should not be approved.

58.     All rights of the Committee with respect to the Disclosure Statement, the Plan, and the Confirmation Hearing are hereby expressly reserved.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Committee respectfully requests that the Court grant the Committee relief that is consistent with the foregoing or such other relief as the Court deems just and proper.

Dated: August 28, 2025
       Houston, Texas

Respectfully submitted

*/s/ Charles Persons*
**PAUL HASTINGS LLP**
Charles Persons (TX Bar No. 24060413)
2001 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (972) 936-7500
Facsimile: (972) 936-7501
Email: charlespersons@paulhastings.com

-and-

Kristopher M. Hansen (*pro hac vice*)
Erez E. Gilad (*pro hac vice*)
Gabriel Sasson (*pro hac vice*)
G. Alexander Bongartz (*pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: krishansen@paulhastings.com
       erezgilad@paulhastings.com
       gabesasson@paulhastings.com
       alexbongartz@paulhastings.com

-and-

Nicholas A. Bassett (*pro hac vice*)
2050 M Street NW
Washington, D.C. 20036
Telephone: (202) 551-1700
Facsimile: (202) 551-1705
Email: nicholasbassett@paulhastings.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

**<u>Certificate of Service</u>**

I certify that on August 28, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>*/s/ Charles Persons*          </u>
Charles Persons