IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| LifeScan Global Corporation, *et al.*,[1] | ) ) | Case No. 25-90259 (ARP) |
| Debtors. | ) ) ) | (Jointly Administered) (Relates to Dkt. No. 19) |

**DEBTORS' REPLY TO OBJECTIONS TO THEIR OMNIBUS
MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING REJECTION OF
CERTAIN EXECUTORY CONTRACTS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors" and, together with their non-debtor affiliates, "LifeScan" or the "Company") submit this reply to (i) the *Limited Objection to the Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts and (II) Granting Related Relief* [Dkt. No. 120] (the "Ascent/ESI Objection") filed by Ascent Health Services, LLC ("Ascent") and Express Scripts, Inc. ("ESI"), (ii) the *Limited Objection to the Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts and (II) Granting Related Relief* [Dkt. No. 150] (the "Prime Objection") filed by Prime Therapeutics LLC ("Prime"), and (iii) the *Limited Objection of the State of Connecticut Department of Social Services to the Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts and (II) Granting Related Relief* [Dkt. No. 228] (the "Connecticut Objection" and, together with the Ascent/ESI Objection

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: LifeScan Global Corporation (1872); DUV Holding Corp. (2522); DUV Intermediate Holding Corp. (2645); LifeScan Texas LLC (1307); DUV Intermediate Holding II Corp. (4829); LifeScan Inc. (8188); LifeScan IP Holdings, LLC (7450); LifeScan China, LLC (N/A) and LifeScan Institute LLC (8188). The location of Debtor LifeScan Global Corporation's principal place of business and the Debtors' service address in these Chapter 11 cases is 75 Valley Stream Parkway, Suite 201, Malvern, PA 19355.

and the Prime Objection, the "Objections") filed by the State of Connecticut Department of Social Services ("Connecticut" and, together with Ascent, ESI, and Prime, the "Objectors").

## BACKGROUND

### A. Negotiations Concerning the Relevant Contracts

1. As previewed with the Court at the first day hearing and the cash collateral hearing (as well as in the *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts and (II) Granting Related Relief* [Dkt. No. 19] (the "Rejection Motion")[2] and in the First Day Declaration), the Debtors are in the midst of an operational restructuring to use the chapter 11 toolkit to free themselves of uneconomical and burdensome contracts with pharmacy benefit managers ("PBMs")[3] and state Medicaid entities (together with PBMs, the "Rebate Counterparties"), including the Objectors.[4] It is no hyperbole to say that the Debtors would not be in chapter 11 if access to the lucrative managed-care market in the U.S. was not controlled by the Rebate Counterparties who had the ability to effectively dictate terms to LifeScan. Because of the acute nature of these challenges, immediately after execution of the restructuring support agreement (the "RSA") in late 2024, LifeScan, as contemplated by the RSA, initiated a months-long campaign to renegotiate each Rebate Agreement on more sustainable terms, including the Rebate Agreements with the Objectors (the "Relevant Contracts"). As further described in the *Declaration of Michael Niarchos in Support of the Debtors' Reply to Objections to their Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory*

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Rejection Motion.

[3] PBMs are third-party administrators of prescription drug benefits for health insurance plans. PBMs negotiate drug pricing, process prescription claims, and provide rebates to insurance companies and healthcare providers.

[4] Connecticut is not a direct Rebate Counterparty; instead, the applicable Relevant Contract (as defined below) is between LifeScan and a third-party pharmacy benefit administrator, Prime, under which LifeScan paid rebates to participating states (including Connecticut) for the utilization of certain of LifeScan's products in the participating states' Medicaid programs.

*Contracts and (II) Granting Related Relief* (the "<u>Niarchos Declaration</u>"), filed contemporaneously herewith, the Company and its advisors engaged in introductory meetings followed by numerous negotiations with the Objectors concerning the terms of the Relevant Contracts, including the exchange of numerous proposals.

2. The Company's ***very first step*** in the negotiations with the Rebate Counterparties in early 2025 was to inform them, as shown in the image below by way of example, that LifeScan would have no choice but to file for chapter 11 and reject the Relevant Contracts immediately thereafter unless the Rebate Counterparties could provide meaningful concessions to the Company:



*See* Niarchos Declaration ¶¶ 13, 14. Each of the Objectors were intimately involved in these negotiations. As further described in the Niarchos Declaration, in February of 2025 (in the case of Ascent and ESI) and in March of 2025 (in the case of Connecticut, through Prime), LifeScan's advisors met directly with each of the Rebate Counterparties, including the Objectors, to provide an overview of LifeScan's financial situation and to outline proposed adjustments to the Rebate

3

Agreements, including the Relevant Contracts. *See* Niarchos Declaration ¶¶ 11-12. In those meetings and in presentations prepared for the Rebate Counterparties (the "Presentations"), LifeScan made clear that the only alternative path forward absent an agreement on adjustments to the Relevant Contracts was a chapter 11 filing followed by an ***immediate*** request to reject the Relevant Contracts, and that, thereafter, the Objectors would have a right to file a claim for rejection damages. Niarchos Declaration ¶¶ 13, 14. The Company and its advisors also informed the Rebate Counterparties, including the Objectors, in February and March of 2025 that, as a condition to LifeScan's first and second lien lenders forbearing from enforcing remedies under their respective credit agreements, LifeScan had commenced preparation for a chapter 11 filing. Niarchos Declaration ¶¶ 13, 14.

3. Following those initial meetings and the provision of the Presentations to the Objectors, LifeScan continued for months to engage and negotiate with the Objectors in good faith and offered the Rebate Counterparties terms ***far in excess*** of what they would ultimately be slated to receive under the proposed chapter 11 plan. *See* Niarchos Declaration ¶ 15. Ultimately, however, the Company was not able to reach an agreement on adequate terms with the majority of the Rebate Counterparties. On or about June 25, 2025, LifeScan's advisors informed each of the Objectors (in the case of Connecticut, through Prime) that, given the failure of the negotiations, LifeScan's next step would be to file for chapter 11 protection. Niarchos Declaration ¶¶ 16-17.

  **B.** **The Relevant Proceedings**

4. On July 15, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Simultaneously, the Debtors filed certain "first day motions," including the *Debtors' Emergency Motion for Entry of an Order Authorizing Them to Pay Prepetition Claims Incurred Under Customer Programs* [Dkt. No. 13] (the "Customer Programs Motion"). The Customer Programs Motion described LifeScan's extensive rebate

4

program and associated Rebate Agreements and explained that, through the contemporaneously filed Rejection Motion, the Debtors were seeking to reject numerous (i) "pharmacy benefit manager contracts with . . . Express Scripts"; (ii) "group purchasing organization contracts with Ascent"; and (iii) "Medicaid rebate contracts with 22 states, including some through the pharmacy benefit administrator Prime Therapeutics, which negotiates rebates collectively for participating states." *See* Customer Programs Motion ¶ 16.

5.  Exactly as LifeScan told the Objectors in the Presentations, the Debtors' first day motions also included the Rejection Motion, which sought entry of an order authorizing the Debtors to reject numerous contracts listed on Schedule 1 annexed thereto (the "<u>Rejected Contracts</u>") *nunc pro tunc* to the Petition Date. The Rejection Motion was filed at 1:30 A.M. central time on July 16, 2025, just before the Debtors filed the First Day Declaration. As summarized below, each of the Objectors filed an almost identical objection to the Rejection Motion complaining in essence that the fact that the Debtors filed the Rejection Motion approximately 90 minutes after midnight somehow prejudiced them. Ascent and ESI also assert that they were "unaware" of the Debtors' intention to reject their contracts until the Rejection Motion hit the docket. Both of these assertions are clearly untrue.

6.  On July 28, 2025, Ascent and ESI filed the Ascent/ESI Objection. On August 6, 2025, Prime filed the Prime Objection.

7.  Also on August 6, 2025, the Ohio Department of Medicaid, on behalf of itself and numerous joining states (including Connecticut) (together, the "<u>Joining States</u>"), filed the *Motion for an Extension of Time in Which to Object/Respond to Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts and (II) Granting Related Relief* [Dkt. No. 149].

5

8. On August 12, 2025, the Debtors, the Ohio Department of Medicaid, and the Joining States entered into the *Stipulation and Agreed Order (A) Extending the Deadline for Certain Parties to Respond to Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts and (II) Granting Related Relief and (B) Withdrawing Ohio Department of Medicaid's Motion for an Extension of Time in Which to Object/Respond to Debtors' Omnibus Motion* [Dkt. No. 166] (the "Stipulation"), stipulating to a response/objection deadline of August 22, 2025 for the Ohio Department of Medicaid and the Joining States. On August 13, 2025, the Court entered the Stipulation. On August 22, 2025, Connecticut filed the Connecticut Objection.

9. On August 20, 2025, the Debtors filed the *Certificate of No Objection to Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts and (II) Granting Related Relief* [Dkt. No. 224], seeking entry of an order authorizing rejection of the Rejected Contracts other than those subject to the (i) Ascent/ESI Objection, (ii) Prime Objection, and (iii) Stipulation. On August 21, 2025, the Court entered an order authorizing rejection of such contracts *nunc pro tunc* to the Petition Date [Dkt. No. 225] (the "Initial Rejection Order"). The Debtors respectfully submit that the Relevant Contracts should also be rejected *nunc pro tunc* to the Petition Date.

**ARGUMENT**

**I.    Relief *Nunc Pro Tunc* to the Petition Date is Warranted**

10. Rejection of executory contracts *nunc pro tunc* to the petition date is typical and granted frequently in this Court. *See, e.g.*, *In re EXCO Res., Inc.*, Case No. 18-30155 [Dkt. No. 446] (authorizing rejection of executory contracts *nunc pro tunc* to the petition date); *In re Dig. Media Sols., Inc.*, Case No. 24-90468 [Dkt. No. 199] (same); *In re Northstar Offshore Group, LLC*, Case No. 16-34028 [Dkt. No. 948] (approving rejection retroactively to a date prior to

6

motion's filing); *In re Desktop Metal, Inc.*, Case No. 25-90268 [Dkt. No. 229] (same); *In re Lion Ribbon Texas Corp.*, Case No. 25-90164 [Dkt. No. 256] (rejecting sales representative agreements *nunc pro tunc* to the petition date); *In re Sunnova Energy International, Inc.*, Case No. 25-90160 [Dkt. No. 320] (rejecting contracts and leases as of the petition date); *In re Everstream Solutions LLC*, Case No. 25-90144 [Dkt. Nos. 26-28, 191-193] (rejecting leases and contracts *nunc pro tunc* to the petition date); *In re MLN US Holdco LLC*, Case No. 25-90090 [Dkt. No. 190] (rejecting lease as of the petition date); *In re Party City Holdco Inc.*, Case No. 24-90621 [Dkt. No. 265] (rejecting contracts and leases as of the petition date); *In re H-Food Holdings, LLC*, Case No. 24-90586 [Dkt. No. 191] (rejecting lease *nunc pro tunc* to the petition date); *In re DRF Logistics, LLC*, Case No. 24-90447 [Dkt. No. 426] (rejecting lease as of the petition date); *In re Orbital Infrastructure Group, Inc.*, Case No. 23-90763 [Dkt. No. 162] (rejecting contracts and leases as of the petition date). Indeed, here, the Initial Rejection Order authorized the rejection of numerous Rebate Agreements as of the Petition Date.

11. In fact, the Objectors have conceded—as they must—the Court's authority to grant retroactive relief on the Rejection Motion (*see* Ascent/ESI Objection ¶¶ 9, 13; Prime Objection ¶¶ 9, 14 ; Connecticut Objection ¶¶ 10, 13), and they only request that any *nunc pro tunc* rejection be effective not as of the Petition Date but as of the next day thereafter, based on a technicality— the Rejection Motion hit the docket 90 minutes after midnight on the Petition Date.

12. The Objectors are correct about one thing: "[w]hile [this] objection may seem trivial at first blush, the Parties can assure the Court that the financial repercussions are not. . . . While the Parties are still calculating the amount of rebates that actually accrued on July 15, 2025 – such amount is likely to be substantial based on the historic purchase history in the Parties' pharmacy programs." Ascent/ESI Objection ¶ 10. This is true—the Relevant Contracts are

7

so burdensome that even a *single* day of rebate obligations results in a significant financial burden on the Debtors. That is precisely the reason the Debtors spent the first half of 2025 negotiating with the Rebate Counterparties, seeking to reduce this insupportable burden.

13. The Objectors assert that the 90 minutes by which the filing of the Rejection Motion missed the Petition Date have somehow resulted in their not getting sufficient notice of the proposed rejection. While the sufficiency of notice is, indeed, one of the primary considerations in courts' granting of the equitable relief the Debtors are seeking,[5] this assertion is laughable, particularly in the face of the history of negotiations among the parties.

14. Given the Debtors' significant engagement with the Objectors long before the Petition Date as described herein and in the Niarchos Declaration, including the clear, unequivocal statements made by the Debtors' representatives of their intent to reject the Rebate Agreements immediately upon the Debtors' bankruptcy filing, it is disingenuous, indeed, for the Objectors to now assert that they were somehow surprised by the Rejection Motion or prejudiced in any way by the 90 minutes' difference in the timing thereof. As the prejudice to the Debtors from the proposed change in the rejection date is quite significant, the balancing of the equities[6] clearly weighs toward overruling the Objections and granting the relief sought in the Rejection Motion.

## II. The Objectors Had Notice of the Debtors' Unequivocal Intention to Reject the Relevant Contracts Well Before July 15, 2025

15. As described in the Niarchos Declaration, recognizing that the Rebate Agreements were a substantial financial burden on LifeScan's business, LifeScan began a months-long outreach and negotiation process with Rebate Counterparties in early 2025 with the goal of

---

[5] *See, e.g.*, *In re Cafeteria Operators, L.P.*, 299 B.R. 384, 394 (Bankr. N.D. Tex. 2003) (granting retroactive rejection where debtors' counterparties "had unequivocal notice of Debtors' intent to reject prior to the filing of the Motions").

[6] *See In re Player's Poker Club, Inc.*, 636 B.R. 811, 824-25 (Bankr. C.D. Cal. 2022) (describing *nunc pro tunc* relief as "an ancient tool of equity") (internal quotation marks and citation omitted).

eliminating the excessive fixed rebate costs by either renegotiating or rejecting the Rebate Agreements. That goal and go-forward plan were made crystal clear to the Rebate Counterparties, including the Objectors, from the very beginning of this process. *See* Niarchos Declaration ¶¶ 10, 13-15.

16. The Objections conveniently neglect to mention those months-long negotiations. Instead, they attempt to paint a picture of dumbfounded counterparties who had ***no*** notice of the Debtors' intentions until 1:30 A.M. central time on July 16, 2025. *See, e.g.*, Ascent/ESI Objection ¶ 15 ("The Parties were *unaware* of the Debtors' intention of rejecting the contracts on July 15, 2025. The Parties only knew of the Debtors' intent upon the filing of the [Rejection] Motion." (emphasis added)). That is patently untrue.

17. The Objectors had clear, unequivocal notice of the Company's intent to reject the Relevant Contracts long before the Petition Date. At the start of the Company's attempts to renegotiate the Rebate Agreements in February and March of 2025, the Company made that intent clear as the only alternative if the renegotiation process was to fail. Niarchos Declaration ¶¶ 13, 14. And in June of 2025, the Company informed each of the Objectors that, given the failed negotiations, its next step would be to file its chapter 11 petitions and the Rejection Motion. Niarchos Declaration ¶ 17.

18. Similar sequencing of events has been found sufficient to allow courts to grant retroactive rejection to the petition date. *See, e.g.*, *In re O'Neil Theatres, Inc.*, 257 B.R. 806, 808 (Bankr. E.D. La. 2000) (granting rejection as of the petition date, three days prior to the filing of the rejection motion, in light of failed prepetition negotiations between the debtor and the counterparty and the lack of any benefit accrued to the debtor during those three days); *In re Cafeteria Operators*, 299 B.R. at 394 (finding that the debtors' vacating of the leased premises

9

provided "unequivocal notice" of their intent to reject prior to the filing of the relevant motions). Here, the notice of the planned rejection immediately following the filing of chapter 11 petitions given to the Objectors by LifeScan during months of prepetition negotiations was just as "unequivocal" as the notice in *O'Neil* and *Cafeteria Operators*.

19. Moreover, the Objectors received **additional** unequivocal notice of the Debtors' intent to reject the Relevant Contracts through the Customer Programs Motion filed on the Petition Date. The Customer Programs Motion clearly stated that, through the Rejection Motion (that the Debtors believed to have been filed "contemporaneously"), the Debtors were seeking to reject each of the Relevant Contracts. *See* Customer Programs Motion ¶ 16. Courts have found that sufficient notice of rejection can be provided through motions other than the rejection motion itself. *See, e.g.*, *In re GCP CT Sch. Acquisition, LLC*, 429 B.R. 817, 826-29 (B.A.P. 1st Cir. 2010) ("Although the Bankruptcy Rules clearly require that an affected party be provided reasonable notice and opportunity to be heard regarding the disposition of its unexpired lease, nothing requires that the notice take the form of a specific motion entitled 'motion to reject.'"). In *GCP CT School Acquisition*, the Bankruptcy Appellate Panel for the First Circuit found that while no rejection motion had been filed, the counterparty to a lease had sufficient notice of the debtors' intent to reject the lease through other filed motions—a sale motion, settlement motion, and motion to extend the deadline to assume or reject unexpired leases—which motions "show[ed] that [the counterparty] was notified that its rights under the lease would terminate." *Id*. at 829.

20. The Objectors rely primarily on *In re Fleming Companies, Inc.*, 304 B.R. 85 (Bankr. D. Del. 2003) and *In re Player's Poker Club, Inc.*, 636 B.R. 811 (Bankr. C.D. Cal. 2022) for their assertions that the notice they received was not sufficient. Both cases are inapposite. *Fleming* involved disallowance of certain fees requested by debtors' counsel based on the court's

10

finding that counsel consistently failed to comply with the requirements of the Bankruptcy Code and the court's prior orders. 304 B.R. at 95-96. Given that conduct, as well as the numerous occasions on which the debtors changed their intentions to assume or reject leases, the court found that the debtors' "actions in [the] case do not rise to the level required for nunc pro tunc rejection," *i.e.*, receiving equitable relief. *Id*. at 96. The Debtors here are not attempting to sidestep any of the Bankruptcy Code requirements or the Court's prior orders. Indeed, they are not engaging in the types of conduct that the *Fleming* court found precluded the debtors from *nunc pro tunc* relief.

21. In *Player's Poker Club*, the debtor sought retroactive rejection of a lease as of the petition date or, *in the alternative*, as of the date the rejection motion was filed. 636 B.R. at 814. While the debtor in that case had, before the petition date, conducted a lease-end walkthrough of the premises and returned the keys, the parties had also discussed a potential extension of the lease term. *Id*. at 815-16. Based on such facts, the court found that the counterparty received notice of the debtor's unequivocal intention to reject the lease only once the rejection motion was filed. *Id*. at 830.

22. Unlike in *Player's Poker Club*, there were no mixed signals here regarding the Debtors' unequivocal intentions to reject the Relevant Contracts immediately upon their chapter 11 filings. LifeScan communicated such unequivocal intentions to the Objectors on numerous occasions prior to the Petition Date, and again on the Petition Date through the Customer Programs Motion. Under the circumstances of this case, the Relevant Contracts should be rejected *nunc pro tunc* to the Petition Date.

## CONCLUSION

For the reasons set forth herein, the Debtors request that the Court (i) overrule the Objections, (ii) enter an order rejecting the Relevant Contracts, and (iii) grant such other relief as this Court deems appropriate.

Dated: September 4, 2025

/s/ *John F. Higgins*
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX Bar No. 24122842)
Grecia V. Sarda (TX Bar No. 24132092)
**PORTER HEDGES LLP**
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone:    (713) 226-6000
Facsimile:    (713) 226-6248
Email:    jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com
gsarda@porterhedges.com

-and-

Dennis F. Dunne, Esq. (admitted *pro hac vice*)
Samuel Khalil, Esq. (admitted *pro hac vice*)
Jaimie Fedell, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219
Email:    ddunne@milbank.com
skhalil@milbank.com
jfedell@milbank.com

Andrew M. Leblanc, Esq. (admitted *pro hac vice*)
Melanie W. Yanez, Esq. (admitted *pro hac vice*)
Julie Wolf, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
1101 New York Avenue, NW
Washington, D.C. 20005
Telephone:    (202) 835-7500
Facsimile:    (202) 263-7586
Email:    aleblanc@milbank.com
mwyanez@milbank.com
jwolf@milbank.com

*Proposed Co-Counsel for Debtors in Possession*

**Certificate of Service**

  I certify that on September 4, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                   */s/ John F. Higgins*
                   John F. Higgins